[No. S163905. Dec. 20, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
ALBERT ANDREW ALBILLAR et al., Defendants and Appellants.

**COUNSEL**

Vanessa Place, under appointment by the Supreme Court, for Defendant and Appellant Albert Andrew Albillar.

Sharon M. Jones, under appointment by the Supreme Court, for Defendant and Appellant Alex Adrian Albillar.

Conrad Petermann, under appointment by the Supreme Court, for Defendant and Appellant John Madrigal.

Duane A. Dammeyer, Public Defender (Ventura) and Michael C. McMahon, Chief Deputy Public Defender, for California Public Defenders Association and Public Defender of Ventura County as Amici Curiae on behalf of Defendants and Appellants.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Michael C. Keller, Lawrence M. Daniels, Scott A. Taryle, David A. Wildman and Douglas L. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BAXTER, J.**—Defendants Albert Andrew Albillar, Alex Albillar, and John Madrigal stand convicted by a jury of forcible rape while acting in concert (Pen. Code, §§ 261, subd. (a)(2), 264.1), forcible sexual penetration while acting in concert (*id.*, §§ 289, subd. (a)(1), 264.1), and active participation in a criminal street gang (*id.*, § 186.22, subd. (a)). The jury further found that the sex offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in any criminal conduct by gang members. (*Id.*, § 186.22,

subd. (b).) Defendants challenge the sufficiency of the evidence supporting their convictions of the substantive gang offense as well as the gang enhancements. This appeal raises three issues.

The first involves the substantive offense defined by Penal Code section 186.22, subdivision (a) (section 186.22(a)), which punishes "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang." Does this offense include an unwritten requirement that the "felonious criminal conduct" that is promoted, furthered, or assisted be gang related? We conclude it does not.

The remaining issues involve the enhancement defined by Penal Code section 186.22, subdivision (b)(1) (section 186.22(b)(1)), which adds specified penalties for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." Was there sufficient evidence to support the first prong— i.e., that the charged sex offenses were "committed for the benefit of, at the direction of, or in association with" a criminal street gang? And does the second prong require evidence that the charged sex offenses were committed with the specific intent to promote, further, or assist *other* criminal conduct by *the gang*—i.e., gang-related criminal conduct apart from the charged offenses? We conclude that these offenses were committed for the benefit of and in association with the gang. We also conclude, in accordance with the plain language of the enhancement, that the scienter element of the enhancement requires only "the specific intent to promote, further, or assist in *any* criminal conduct by *gang members*." (§ 186.22(b)(1), italics added.)

We therefore affirm the judgment of the Court of Appeal.

### BACKGROUND

In December 2004, twin brothers Albert and Alex Albillar and their cousin, John Madrigal, lived in an apartment in Thousand Oaks. All three defendants were in their 20's. All three were also members of the Southside Chiques gang.

On December 29, 2004, the three defendants met up with 15-year-old Amanda M., her friend, 14-year-old Carol M., and a third girl, Adriana, who was 16. Amanda knew that Alex and Albert were gang members but was not afraid of them, since neither of them had ever threatened her. But when Amanda was alone with the three defendants, Albert suggested to Amanda

that they "have a foursome." Amanda, who did not have a "romantic relationship" with any of the defendants, replied "no" in a laughing manner. She did not think he was serious.

Later on, the group went to defendants' apartment. Albert brought Carol to the bedroom. He took off her pants and licked her vagina. After asking for her consent and hearing no reply, he engaged in sexual intercourse with her. Carol became upset, though, and told him to stop. He immediately withdrew. When she came out of the room, alone, she was crying and said she wanted to go home.

Defendants and the three girls got back in the car. Carol and Adriana were dropped off separately. On the way to Amanda's house, one of the defendants said he needed to make a stop at their apartment to use the bathroom, so Amanda accompanied them as they returned to the apartment. Amanda believed the stop would be brief and telephoned Carol to tell her so.

Once at the apartment, though, Albert told Amanda he wanted to talk to her alone in the bedroom. He told her he had engaged in oral sex and sexual intercourse that evening with Carol but had stopped "right away" when she told him to stop. Albert then kissed Amanda and removed her jeans. When Alex and Madrigal opened the bedroom door and asked if they could "get in," Amanda yelled, "No. Get out." But Alex and Madrigal paid her no heed. Albert moved off Amanda and grabbed one of her legs, while Madrigal grabbed the other, spreading her legs apart. Alex, who weighed considerably more than Amanda, climbed on top of her and pinned her hands above her head with one arm. He used the other to push her panties to one side and digitally penetrated her vagina. Amanda struggled to close her legs and told defendants to get away from her, but Alex had his full body weight on top of her, and Albert and Madrigal continued to hold her legs apart. Meanwhile, Alex withdrew his finger, inserted his penis, and raped her.

When Alex finished, Madrigal got on top of her. Although he had a Southside Chiques gang tattoo on his face, Amanda slapped him. He replied in a threatening manner, "You don't even know what you just did," bit her thigh and shoulder, and thrust his fingers in her vagina. He attempted to kiss her on the mouth, but she moved her head back and forth, and told him repeatedly "no," "stop," and "get off me." Although Amanda tried to push Madrigal away, he proceeded to rape her—while the two other defendants stood in the doorway watching and giggling.

Amanda tried to get up after Madrigal had finished, but Albert pushed her back on the bed, climbed on top of her, and stuck his fingers into her vagina. She told him to stop, but he did not listen. Instead, he withdrew his fingers

and raped her. Amanda continued to protest and then tried to pretend the rape was not happening. Albert ended by ejaculating on her stomach. Defendants subsequently drove her home.

Amanda originally did not want to tell anyone what had happened because "she feared that since the suspects were gang members they [would] come after her family." After some coaxing, though, Amanda told her younger sister and a few friends what was wrong and what had happened to her. When defendants became aware of the allegations Amanda was making, Amanda received a telephone call from Jazmin Sarabia, whose boyfriend was a Southside Chiques gang member and who was herself friends with defendants. Jazmin warned that Amanda and her family could be hurt if they told the police. Amanda became fearful for her family and decided to tell her parents what happened. They then contacted the police. Before the police were notified, though, Amanda and her mother also received threatening telephone calls from Albert's girlfriend, Carol M., as well as from Jazmin.

Oxnard Police Detective Neail Holland testified as an expert about gangs in Oxnard and the Southside Chiques gang in particular. Southside Chiques, whose membership is mostly Hispanic, claims part of Oxnard as its "turf," although its crimes are not limited to that specific geographic area. The gang has engaged in a pattern of "violent and vicious and brutal" crimes against a wide assortment of victims—"rival gangs, residents within their community, residents outside their community, family members, people that are close to them and even members within their own gang."

Southside Chiques gang members obtain status within the gang through various means, including committing crimes and assisting other gang members in committing crimes. Gang members commit crimes together to increase their chances of success, to bolster their confidence in one another, and to enable the participants to boast about each other's criminal endeavors to those who were not present, since gang members would not necessarily increase their status by "going out and committing crimes by themselves and then coming back and bragging about it to the rest of the gang with absolutely no proof of its occurrence." Alternatively, a gang member could lose status by "not supporting gang members when they're out committing crimes or committing gang activities." Gang members also rely on intimidation and violence to gain "respect" in the community and to further the gang's interests.

In responding to a hypothetical based on the circumstances of this gang rape, Holland opined that such a crime would have been committed for the benefit of, at the direction of, or in association with a criminal street gang. His opinion was based on the way in which the gang members worked

cooperatively to accomplish the rapes, the brutality and viciousness of the crimes, and the enhancement to the reputations for violence and viciousness of the gang and the participating gang members.

A jury convicted defendants of the forcible rape of Amanda M. while acting in concert and the forcible rape of Amanda M. by a foreign object while acting in concert, both of which were committed for the benefit of, at the direction of, or in association with a criminal street gang. The jury also found that all defendants had actively participated in a criminal street gang. Albert was convicted of the additional offense of unlawful sexual intercourse with a minor, Carol M. (Pen. Code, § 261.5, subd. (c).) The trial court sentenced Albert to 20 years in prison, Alex to 24 years four months, and Madrigal to 19 years four months.

The Court of Appeal affirmed in a published opinion. As pertinent here, the Court of Appeal rejected defendants' challenge to the sufficiency of the evidence underlying the substantive gang offense and the gang enhancements. We granted defendants' petitions for review, limited to the question whether substantial evidence supported the convictions under sections 186.22(a) and 186.22(b)(1), which are part of the California Street Terrorism Enforcement and Prevention Act (STEP Act; Pen. Code, § 186.20 et seq.).

## I

### The Sufficiency of the Evidence Supporting the Substantive Gang Offense (§ 186.22(a))

Defendants were convicted of violating section 186.22(a), which provides: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished . . . ." Defendants contend that this gang offense includes an implied requirement that the felonious criminal conduct be gang related, and that the record is devoid of evidence that the criminal conduct they promoted, furthered or assisted was gang related. We conclude, in accordance with the text of the statute, that a violation of section 186.22(a) is established when a defendant actively participates in a criminal street gang with knowledge that the gang's members engage or have engaged in a pattern of criminal activity, and willfully promotes, furthers, or assists in *any* felonious criminal conduct by gang members.

We begin with the familiar canon that, when construing statutes, our goal is " ' "to ascertain the intent of the enacting legislative body so that we

may adopt the construction that best effectuates the purpose of the law." ' " (*City of Santa Monica v. Gonzalez* (2008) 43 Cal.4th 905, 919 [76 Cal.Rptr.3d 483, 182 P.3d 1027].) "We first examine the words of the statute, 'giving them their ordinary and usual meaning and viewing them in their statutory context, because the statutory language is usually the most reliable indicator of legislative intent.' " (*Ibid.*) " 'If the language of the statute is not ambiguous, the plain meaning controls and resort to extrinsic sources to determine the Legislature's intent is unnecessary.' " (*People v. Traylor* (2009) 46 Cal.4th 1205, 1212 [96 Cal.Rptr.3d 277, 210 P.3d 433].)

As defendants Albert Albillar and Alex Albillar concede, section 186.22(a) is not facially ambiguous. (See *People v. Castenada* (2000) 23 Cal.4th 743, 752 [97 Cal.Rptr.2d 906, 3 P.3d 278] ["Through section 186.22(a)'s plainly worded requirements—criminal knowledge, willful promotion of a felony, and active participation in a criminal street gang—our Legislature has made it reasonably clear what conduct is prohibited . . . ."].) The provision criminalizes active participation in a criminal street gang by a person who has the requisite knowledge and who "willfully promotes, furthers, or assists in *any* felonious criminal conduct by members of that gang." (§ 186.22(a), italics added.) The plain language of the statute thus targets felonious criminal conduct, not felonious gang-related conduct. Where there is no ambiguity in the statutory text, " 'then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs.' " (*Lennane v. Franchise Tax Bd.* (1994) 9 Cal.4th 263, 268 [36 Cal.Rptr.2d 563, 885 P.2d 976].)

"[J]udicial construction of unambiguous statutes is appropriate only when literal interpretation would yield absurd results." (*Simmons v. Ghaderi* (2008) 44 Cal.4th 570, 583 [80 Cal.Rptr.3d 83, 187 P.3d 934].) But there is nothing absurd in targeting the scourge of gang members committing *any* crimes together and not merely those that are gang related. Gang members tend to protect and avenge their associates. Crimes committed by gang members, whether or not they are gang related or committed for the benefit of the gang, thus pose dangers to the public and difficulties for law enforcement not generally present when a crime is committed by someone with no gang affiliation. "These activities, both individually and collectively, present a clear and present danger to public order and safety . . . ." (Pen. Code, § 186.21.)

The gravamen of the substantive offense set forth in section 186.22(a) is active participation in a criminal street gang. We explained in *People v. Castenada, supra,* 23 Cal.4th 743, that the phrase "actively participates" reflects the Legislature's recognition that criminal liability attaching to membership in a criminal organization must be founded on concepts of personal guilt required by due process: "a person convicted for active membership in a criminal organization must entertain 'guilty knowledge and intent' of the

organization's criminal purposes." (*Id.* at p. 749.) Accordingly, the Legislature determined that the elements of the gang offense are (1) active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; (2) knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and (3) the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang. (*People v. Lamas* (2007) 42 Cal.4th 516, 523 [67 Cal.Rptr.3d 179, 169 P.3d 102].) All three elements can be satisfied without proof the felonious criminal conduct promoted, furthered, or assisted was gang related.

The Legislature clearly knew how to draft language limiting the nature of the criminal conduct promoted, furthered, or assisted and could have included such language had it desired to so limit the reach of section 186.22(a). Indeed, the Legislature did exactly that in the subdivision immediately following—i.e., section 186.22(b)(1), which provides for an enhanced sentence for "any person who is convicted of a felony committed *for the benefit of, at the direction of, or in association with any criminal street gang*, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (Italics added.) " '[W]hen different words are used in contemporaneously enacted, adjoining subdivisions of a statute, the inference is compelling that a difference in meaning was intended.' " (*Kleffman v. Vonage Holdings Corp.* (2010) 49 Cal.4th 334, 343 [110 Cal.Rptr.3d 628, 232 P.3d 625].)

The absence of ambiguity in the statutory language dispenses with the need to review the legislative history. We note, however, that the legislative history is consistent with a plain language construction of the statute. Senate Bill No. 1555 (1987–1988 Reg. Sess.) (Senate Bill No. 1555), the bill that was chaptered as Statutes 1988, chapter 1256, eventually enacted the first Penal Code section 186.22, included in its original form a gang-related-activity requirement of the type defendants now ask us to impose. The original bill created a separate offense for "[a]ny person who actively conducts or participates, directly or indirectly, in any gang, with the specific intent to promote or further any of its criminal *gang-related activity* or to assist in continuing its pattern of criminal *gang-related activity*. . . ." (Sen. Bill. No. 1555, as introduced Mar. 6, 1987, § 1, p. 5, italics added [proposing Pen. Code, § 186.13, subd. (a)].) When the bill was amended to consolidate the substantive gang offense and create a separate enhancement on May 22, 1987, the italicized language was deleted throughout. The amended bill added a new section 186.22 to the Penal Code, which provided that "[a]ny person who actively participates in any criminal street gang with knowledge that its members or participants engage in or have engaged in a pattern of criminal gang activity" was guilty of a felony if the person "willfully promotes, furthers, or assists in *any* criminal conduct by gang members or participants,"

and provided for an alternative felony-misdemeanor "wobbler" if the person had "the specific intent to promote, further, or assist in *any* criminal conduct by its members or participants." (Sen. Bill No. 1555, as amended May 22, 1987, § 1, pp. 10–11, italics added.) Subsequent amendments deleted the specific intent requirement, deleted the reference to "participants," and added the word "felonious" to the "criminal conduct" that was promoted, furthered, or assisted, so that the definition of the gang offense, a wobbler, read (as the current version of § 186.22(a) still reads): "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished . . . ." (Sen. Bill No. 1555, as amended June 23, 1987, § 1, pp. 5–6; former § 186.22(a), as enacted by Stats. 1988, ch. 1256, § 1, p. 4179, repealed and reenacted by Stats. 1989, ch. 930, §§ 5, 5.1, pp. 3251, 3253.) The elimination of the bill's original requirement that the felonious conduct be gang related is "significant indicia of legislative intent." (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1192 [48 Cal.Rptr.3d 108, 141 P.3d 225].)

Defendants cite to a number of letters and reports submitted by various persons and groups to the Legislature in support of Senate Bill No. 1555. In purporting to summarize the effect of the proposed legislation, these materials often referred to the need for stricter laws against "gang-related" activity. Some of these materials predated the May 22, 1987, amendments and thus did not purport to address the language that was ultimately enacted, while others do not appear to distinguish between the substantive crime set forth in section 186.22(a) and the enhancement set forth in section 186.22(b)(1). In any event, summaries submitted to the Legislature by outside parties cannot alter the plain statutory language the Legislature actually enacted, which contains no requirement that the felonious criminal conduct be gang related. (*Exxon Mobil Corp. v. Allapattah Services, Inc.* (2005) 545 U.S. 546, 568 [162 L.Ed.2d 502, 125 S.Ct. 2611]; cf. *Vasquez v. State of California* (2008) 45 Cal.4th 243, 252–253 [85 Cal.Rptr.3d 466, 195 P.3d 1049].)

Defendants argue next that even if the statute does not include a requirement that the felonious criminal conduct be gang related, the federal Constitution would compel one. In their view, omission of such a requirement would create a status offense in violation of *Scales v. United States* (1961) 367 U.S. 203 [6 L.Ed.2d 782, 81 S.Ct. 1469]. *Scales*, however, is distinguishable. The statute at issue in *Scales* made "a felony the acquisition or holding of knowing membership in any organization which advocates the overthrow of the Government of the United States by force or violence." (*Id.* at p. 205.) The high court construed the statute to require active membership and, as so construed, upheld it despite the absence of any element requiring a specific act of criminality, placing active membership in the same category as

criminal conspiracy and complicity—"particular legal concepts manifesting the more general principle that society, having the power to punish dangerous behavior, cannot be powerless against those who work to bring about that behavior." (*Id.* at p. 225.)

In *People v. Castenada, supra,* 23 Cal.4th 743, we noted that section 186.22(a) similarly required active participation in the gang, which means evidence that the defendant's involvement is more than nominal or passive. (*Castenada,* at p. 745.) "Under *Scales,* the due process requirement that criminal liability rest on personal guilt means simply that a person convicted for active membership in a criminal organization must entertain 'guilty knowledge and intent' of the organization's criminal purposes." (*Id.* at p. 749.) "This explains why the Legislature expressly required in section 186.22(a) that a defendant not only 'actively participates' in a criminal street gang . . . but also that the defendant does so with 'knowledge that [the gang's] members engage in or have engaged in a pattern of criminal gang activity,' and that the defendant 'willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang.' These statutory elements necessary to prove a violation of section 186.22(a) exceed the due process requirement of personal guilt that the United States Supreme Court articulated in *Scales* . . . ." (*Castenada, supra,* 23 Cal.4th at p. 749; accord, *Holder v. Humanitarian Law Project* (2010) 561 U.S. ___, ___ [177 L.Ed.2d 355, 130 S.Ct. 2705, 2718].)

We also said in *Castenada* that the phrase "actively participates" needs no further description to prevent arbitrary law enforcement and provide adequate notice to potential offenders, explaining that to participate "actively" in an enterprise means an involvement that is more than nominal or passive (*People v. Castenada, supra,* 23 Cal.4th at p. 747), and that the distinction between active and nominal participation is well understood in common parlance (*id.* at p. 752). Although unnecessary to our decision, we added: "every person incurring criminal liability under section 186.22(a) has aided and abetted a separate felony offense committed by gang members. [Citation.] By linking criminal liability to a defendant's criminal conduct in furtherance of a street gang, section 186.22(a) reaches only those street gang participants whose gang involvement is, by definition, 'more than nominal or passive.' " (*People v. Castenada, supra,* at p. 752.) Defendants insist our reference in *Castenada* to "criminal conduct in furtherance of a street gang" evidences our agreement with their argument that section 186.22(a) would pass constitutional muster only if it were to link a defendant's criminal liability to a separate felony offense committed by street gang members in *furtherance of the gang.* But we made the quoted statement in response to a different argument, i.e., that the phrase "actively participates" fails to provide fair warning of the conduct section 186.22(a) prohibits, pointing out that Castenada reasonably would have understood that his crime committed in furtherance of the gang was evidence of active participation. (*Castenada,*

*supra*, at p. 752.) We were not presented in *Castenada* with the specific argument raised by defendants here and, indeed, other parts of the opinion acknowledged the enhancement's application "to those who promote, further, or assist a specific felony committed by *gang members*." (*Id.* at p. 749, italics added; see also *id.* at pp. 750–751.) The isolated remark seized on by defendants, therefore, provides no authority for their argument. (*Chevron U.S.A., Inc. v. Workers' Comp. Appeals Bd.* (1999) 19 Cal.4th 1182, 1195 [81 Cal.Rptr.2d 521, 969 P.2d 613].)

██ Having now considered the argument that the phrase "any felonious criminal conduct" in section 186.22(a) refers only to gang-related felonious criminal conduct, we reject it. Defendants do not otherwise challenge the sufficiency of the evidence underlying their convictions of the substantive gang offense.

## II

### The Sufficiency of the Evidence Supporting the Gang Enhancement (§ 186.22(b)(1))

The jury also found that defendants violated section 186.22(b)(1), which provides: "[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished . . . ." Defendants contend that the evidence was insufficient to satisfy the first prong of the enhancement, in that there was no evidence the sex offenses were committed for the benefit of, at the direction of, or in association with Southside Chiques. As to the second prong, defendant Madrigal argues that there was no evidence the sex offenses were committed with the specific intent to promote, further, or assist *other* criminal conduct by gang members, and all three defendants argue that there was no evidence the sex offenses were committed with the specific intent to facilitate criminal conduct by *the gang*. None of these contentions has merit.

### A

Defendants claim there is insufficient evidence that the forcible rape in concert and the forcible digital penetration in concert were committed for the benefit of, at the direction of, or in association with the Southside Chiques, and that the jury findings as to the enhancements on those two counts must be reversed. In considering a challenge to the sufficiency of the evidence to

support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Wilson* (2008) 44 Cal.4th 758, 806 [80 Cal.Rptr.3d 211, 187 P.3d 1041].) We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. (*Ibid.*) If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 [82 Cal.Rptr.3d 323, 190 P.3d 664].) "A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." (*Ibid.*)

■ As we have previously explained, the Legislature included the requirement that the crime to be enhanced be committed for the benefit of, at the direction of, or in association with a criminal street gang to make it "clear that a criminal offense is subject to increased punishment under the STEP Act only if the crime is 'gang related.' " (*People v. Gardeley* (1996) 14 Cal.4th 605, 622 [59 Cal.Rptr.2d 356, 927 P.2d 713].) Not every crime committed by gang members is related to a gang. These crimes, though, were gang related in two ways: they were committed in association with the gang, and they were committed for the benefit of the gang.

### 1

The record supported a finding that defendants relied on their common gang membership and the apparatus of the gang in committing the sex offenses against Amanda M.

Detective Neail Holland, a gang investigator with the Oxnard Police Department, testified that status and respect were two of the most important elements of gang membership. Status can be earned by "being with other [Southside] Chiques gang members, committing crimes," but can be reduced by "not supporting gang members when they're out committing crimes or committing gang activities." Respect can likewise be earned by committing crimes "with other [Southside] Chiques members so that it's recognized within the group that this person is contributing to the gang or is still showing his heart and interest in the gang."

As Holland explained, gang members choose to commit crimes together because "it increases their success of completing the crime. . . . [I]t bolsters each other's confidence in the commission of the crime. It serves as somewhat of a training . . . for a younger gang member to watch the actions and

the level of participation of more senior gang members. They can trust on each other's loyalties. They can handle contingencies that may arise during the commission of crime that they did not plan for initially. They can multi-task during the commission of a crime."

Holland explained that there were further benefits when gang members worked together: "[O]ne of the most important things why gang members commit crimes together is the value of one gang member witnessing another gang member committing the crime because that gang member can share it with others or keep it within the group and bolster this person's status by their level of participation in the crime . . . . [¶] Gang members do not increase their status or reputation by going out, necessarily going out and committing crimes by themselves and then coming back and bragging about it to the rest of the gang with absolutely no proof of its occurrence." By committing crimes together, though, gang members increase their status not only among those participating in the crimes, but also among the entire gang when fellow participants "relay it" to other gang members.

Committing a crime with fellow gang members also enables the participants to rely on intimidation, which is "one of [the gang's] mainstream daily objectives in furthering their gang interest." In addition, the bonds within the gang "would keep people from ratting on their own gang" to the police about the crimes that gang members were committing.

Holland's expert testimony adequately described the relationship between the gang and the current crimes. Because each defendant was a member of the Southside Chiques, he could and did rely on the others' cooperation in committing the offenses against Amanda M.: Albert suppressed his own personal interest in having sex with the victim and immediately yielded to the others when they asked if they could "get in"; without another word' being spoken, Albert and Madrigal held the victim's legs down while Alex raped her; Albert and Alex blocked the door while Madrigal raped her; and Alex and Madrigal remained in the apartment while Albert raped her. Defendants knew, because of the nature of the gang, that no one would be a "rat," which would be "one of the worst things, if not the worst thing the gang can have within itself." As the prosecutor put it in closing argument, "they counted on each other's loyalty to be there and [to] back them up." Defendants also knew that fear of the gang would prevent Amanda from reporting the incident to the police—and, indeed, in the days afterwards, Jazmin Sarabia (who was friends with one gang member, Albert, and was dating another) and Carol M. (who was Albert's girlfriend) warned Amanda and her family that Amanda "would suffer with her life" if they contacted the police.

In short, defendants' conduct exceeded that which was necessary to establish that the offenses were committed in concert. Defendants not only

actively assisted each other in committing these crimes, but their common gang membership ensured that they could rely on each other's cooperation in committing these crimes and that they would benefit from committing them together. They relied on the gang's internal code to ensure that none of them would cooperate with the police, and on the gang's reputation to ensure that the victim did not contact the police. We therefore find substantial evidence that defendants came together *as gang members* to attack Amanda M. and, thus, that they committed these crimes in association with the gang. (See *People v. Ochoa* (2009) 179 Cal.App.4th 650, 661, fn. 7 [102 Cal.Rptr.3d 108]; *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1332 [70 Cal.Rptr.3d 680]; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1179, 1198 [5 Cal.Rptr.3d 615]; accord, *Jackson v. State* (2000) 272 Ga. 191 [528 S.E.2d 232, 234–235].)

It is true, as defendants point out, that defendants were related to each other and lived together, and "it is conceivable that several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang." (*People v. Morales, supra,* 112 Cal.App.4th at p. 1198.) Here, though, the record contains no evidence concerning the *significance* of those family ties to defendants' criminal activity in this instance or in any other. One may observe, however, "that gang members frequently come from families in which relatives were also gang members." (Conly, Street Gangs: Current Knowledge and Strategies (1993) p. 18.) Therefore, to presume, as defendants urge, that family ties necessarily predominate over gang affiliation when gang members who are related commit crimes together would substantially eviscerate the gang enhancement.

Indeed, the record here refutes the defense claim that defendants' relationship and commitment to the Southside Chiques was merely "superficial." Alex had a gang tattoo across his chest and abdomen, in very large letters; Albert had gang tattoos on his neck, back, and forearm, as well as a misspelled gang tattoo on his stomach; and Madrigal had a gang tattoo on his face, which "shows that the individual has a lot of love for that gang and is continually representing the gang and his affiliation with it." The apartment they shared was "saturated" with gang paraphernalia—gang clothing, photographs of themselves and fellow gang members wearing gang clothing and flashing gang signs, papers with gang graffiti, and a phone list of fellow gang members. Accordingly, the jury, which was presented with the competing inferences, was entitled to credit the evidence that the attack on Amanda M. was gang related, not family related. (*People v. Martinez, supra,* 158 Cal.App.4th at pp. 1332–1334; *People v. Garcia* (2007) 153 Cal.App.4th 1499, 1512 [64 Cal.Rptr.3d 104]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1382–1383 [37 Cal.Rptr.2d 596]; see generally *People v. Millwee* (1998) 18 Cal.4th 96, 132 [74 Cal.Rptr.2d 418, 954 P.2d 990]; *Juchert v. California Water Service Co.* (1940) 16 Cal.2d 500, 507–508 [106 P.2d 886].) Under the

circumstances here, it strains credulity to argue, as defendants do, that their common gang membership "had nothing to do with this rape," "was an irrelevancy to the sexual offenses," "a mere incidental to their lives; akin to school loyalty, or which football team they favored, or whether they drank their coffee with or without cream."

## 2

The record also supported a finding that the crimes were committed to benefit the Southside Chiques gang.

Holland testified that "[w]hen three gang members go out and commit˙ a violent brutal attack on a victim, that's elevating their individual status, and they're receiving a benefit. They're putting notches in their reputation. When these members are doing that, the overall entity benefits and strengthens as a result of it." Reports of such conduct "rais[e] the[] level of fear and intimidation in the community." Holland then applied his analysis to a hypothetical based on the facts of the crime here, where the victim knew that at least two of her assailants were members of Southside Chiques. "More than likely this crime is reported as not three individual named Defendants conducting a rape, but members of [Southside] Chiques conducting a rape, and that goes out in the community by way of mainstream media or by way of word of mouth. That is elevating [Southside] Chiques' reputation to be a violent, aggressive gang that stops at nothing and does not care for anyone's humanity."

■ Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was "committed for the benefit of . . . a[] criminal street gang" within the meaning of section 186.22(b)(1). (See, e.g., *People v. Vazquez* (2009) 178 Cal.App.4th 347, 354 [100 Cal.Rptr.3d 351] [relying on expert opinion that the murder of a nongang member benefited the gang because "violent crimes like murder elevate the status of the gang within gang culture and intimidate neighborhood residents who are, as a result, 'fearful to come forward, assist law enforcement, testify in court, or even report crimes that they're victims of for fear that they may be the gang's next victim or at least retaliated on by that gang . . .' "]; *People v. Romero* (2006) 140 Cal.App.4th 15, 19 [43 Cal.Rptr.3d 862] [relying on expert opinion that "a shooting of any African-American men would elevate the status of the shooters and their entire [Latino] gang"].)

Defendants contend that *these* crimes could not have been committed to benefit the gang because "it was flatly attested that . . . sex offenses are considered antithetical to [Southside's] ideology and detrimental to an individual member's status within the gang." This overstates Holland's actual

testimony, which was that the "general view" on rape by Latino street gangs "is that it is frowned upon." The jury, of course, was not compelled to assume that Southside Chiques adhered to the general view. Holland's characterization of Latino street gang culture was, in any event, clarified and narrowed by his subsequent testimony that "[i]f someone was convicted, that would be frowned upon. *That* would . . . cause the person to lose status within the gang."

Defendant Alex and defendant Madrigal seize on a snippet of Holland's testimony in an effort to argue that gang members "are not going to come back and announce that they have committed a rape or promote it that it's a rape at all." Defendants reason that a crime committed under such circumstances could not possibly have enhanced the reputation of the gang. A fuller reading of Holland's testimony, however, reveals that he was discussing how gang members who were committing crimes for "themselves or their personal interests" would behave:

"Q. Now, just the mere fact that a rape may be frowned upon, does that prevent a gang member from committing that crime?

"A. No, sir.

"Q. Why not?

"A. Gang members commit all kinds of crimes to further themselves or their personal interest, you know. Crimes that involve some type of sexual gratification occurs by other gang members, by other [Southside] Chiques gang members, they are not going to come back and announce that they have committed a rape or promote it that it's a rape at all, you know, and they're going to claim that law enforcement and the district attorney's office is making stuff up, you know, to protect their position, but these crimes still occur." That gang members who were acting to "further themselves or their personal interest" would keep quiet about a rape does not mean that *all* gang members who commit a rape would do so. Accordingly, this isolated fragment of Holland's testimony did not preclude a jury finding that defendants attacked Amanda M. to benefit the gang.

### B

The second prong of section 186.22(b)(1) requires that a defendant commit the gang-related felony "with the specific intent to promote, further, or assist in any criminal conduct by gang members." Defendant Madrigal contends there is insufficient evidence that he committed the attack on Amanda M. with the specific intent to promote, further, or assist *other* criminal conduct

by gang members. The People respond that section 186.22(b)(1) encompasses the specific intent to promote, further, or assist in *any* criminal conduct by gang members—including the current offenses—and not merely *other* criminal conduct by gang members. We agree with the People.

In *Garcia v. Carey* (9th Cir. 2005) 395 F.3d 1099 (*Garcia*), a divided panel of the Ninth Circuit construed section 186.22(b)(1) to require evidence that a defendant had the specific intent to further or facilitate *other* criminal conduct—i.e., "other criminal activity of the gang apart from" the offenses of which the defendant was convicted. (*Garcia, supra*, at p. 1101.) The majority found insufficient evidence that the particular robbery for which Garcia was convicted "was committed with the specific purpose of furthering other gang criminal activity, and there is nothing inherent in the robbery that would indicate that it furthers some other crime. . . . [¶] . . . [¶] . . . There was testimony that the gang committed robberies, but nothing to indicate why those robberies were aided or intended to be aided by this robbery." (*Id.* at pp. 1103–1104.) Judge Wallace, dissenting, complained that the majority had "misinterpret[ed] the requirements of section 186.22(b)(1)," inasmuch as the provision "does not require proof that the crime of conviction was committed with the intent to further some other specifically identified crime or category of crimes." (*Id.* at p. 1105 (dis. opn. of Wallace, J.).) In addition to the text of the statute itself, the dissenting judge relied on the fact that "California courts have rejected sufficiency of the evidence claims even where such evidence [of a specific intent to further other criminal conduct] was entirely lacking." (*Ibid.*)

In *Briceno v. Scribner* (9th Cir. 2009) 555 F.3d 1069 (*Briceno*), another divided panel, relying on *Garcia*, again granted habeas corpus relief with respect to the gang enhancements, finding insufficient evidence that the charged robberies were committed with the specific intent to facilitate *other* criminal conduct by the gang. (*Briceno, supra*, at p. 1079.) Judge Wardlaw, in dissent, observed that the majority had "conflate[d] the analysis of the two prongs" of the enhancement—i.e., that the defendant committed a felony for the benefit of, at the direction of, or in association with a gang, *and* that the defendant did so with the specific intent to promote, further, or assist in any criminal conduct by gang members—in that "[t]he second prong requires proof *not* that defendant had specific intent to 'benefit' the gang, but that he had the specific intent to 'promote, further, or assist in any criminal conduct by gang members.' " (*Id.* at p. 1084, fn. 2 (conc. & dis. opn. of Wardlaw, J.).) She noted, moreover, that "unequivocal state law" had established "that to prove 'specific intent to . . . assist in any criminal conduct by gang members,' it is sufficient to demonstrate that the 'defendant intended to commit [the crimes], that he intended to commit them in association with [his accomplices], and that he knew that [his accomplices] were members of his gang.' [*People v. Morales, supra*, 112 Cal.App.4th at p. 1197]; *see also People v.*

*Villalobos*, 145 Cal.App.4th 310, 322 [51 Cal.Rptr.3d 678] (2006) ('Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime.'); *People v. Romero*, 140 Cal.App.4th 15, 20 [43 Cal.Rptr.3d 862] (2006) ('There was ample evidence that appellant intended to commit a crime, that he intended to help [his accomplice] commit a crime, and that he knew [his accomplice] was a member of his gang.')." (*Briceno, supra*, 555 F.3d at p. 1084 (conc. & dis. opn. of Wardlaw, J.).) Finally, she remarked that "*Garcia* has been explicitly disapproved in two subsequent California Court of Appeal decisions" and concluded that "California courts could not have indicated more clearly that our interpretation of section 186.22(b) was incorrect." (*Briceno, supra*, 555 F.3d at p. 1088 (conc. & dis. opn. of Wardlaw, J.), citing *People v. Hill* (2006) 142 Cal.App.4th 770, 774 [47 Cal.Rptr.3d 875], and *People v. Romero, supra*, 140 Cal.App.4th at p. 19.)

The conflict between our state courts and the federal courts as to the interpretation of section 186.22(b)(1) has persisted. After *Briceno* was decided, *People v. Vazquez, supra*, 178 Cal.App.4th at pages 353–354, observed, "While our Supreme Court has not yet reached this issue, numerous California Courts of Appeal have rejected the Ninth Circuit's reasoning. As our colleagues noted in *People v. Romero*[, *supra*,] 140 Cal.App.4th [at page] 19 . . . : 'By its plain language, the statute requires a showing of specific intent to promote, further, or assist in "*any* criminal conduct by gang members," rather than *other* criminal conduct. (§ 186.22, subd. (b)(1), italics added.)' . . . [¶] Like the *Romero* court, we reject the Ninth Circuit's attempt to write additional requirements into the statute. It provides an enhanced penalty where the defendant specifically intends to 'promote, further, or assist in any criminal conduct by gang members.' (§ 186.22, subd. (b)(1).) There is no statutory requirement that this 'criminal conduct by gang members' be distinct from the charged offense, or that the evidence establish specific crimes the defendant intended to assist his fellow gang members in committing." (See also *People v. Hill, supra*, 142 Cal.App.4th at p. 774.)

 We agree with this construction of the gang enhancement. In part I, *ante*, we determined that similar statutory language in section 186.22(a), which applies to an active participant in a gang who "willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang," was not ambiguous and extended to *any* felonious criminal conduct, not just felonious gang-related conduct. We likewise find that the scienter requirement in section 186.22(b)(1)—i.e., "the specific intent to promote, further, or assist in any criminal conduct by gang members"—is unambiguous and applies to *any* criminal conduct, without a further requirement that the conduct be "apart from" the criminal conduct underlying the offense of conviction sought to be enhanced.

■ A similar analysis disposes of the related argument, advanced by all three defendants, that section 186.22(b)(1) requires the specific intent to promote, further, or assist a *gang-related* crime. The enhancement already requires proof that the defendant commit a gang-related crime in the first prong—i.e., that the defendant be convicted of a felony committed for the benefit of, at the direction of, or in association with a criminal street gang. (*People v. Gardeley, supra*, 14 Cal.4th at pp. 621–622.) There is no further requirement that the defendant act with the specific intent to promote, further, or assist a *gang*; the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members*. (*People v. Ochoa, supra*, 179 Cal.App.4th at p. 661, fn. 6; accord, *Briceno, supra*, 555 F.3d at p. 1084, fn. 3 (conc. & dis. opn. of Wardlaw, J.) ["Here, only the specific intent element of the statute is at issue. Therefore, the lack of gang-related indicia is not dispositive."].)

As in part I, *ante*, the absence of ambiguity dispenses with the need to review the legislative history, but we do note that the history is again consistent with a plain language construction of the statute. Senate Bill No. 1555, the bill that eventually enacted Penal Code section 186.22, in its original form proposed a separate offense for "[a]ny person who commits any . . . felony, misdemeanor, or infraction . . . if the felony, misdemeanor, or infraction: (1) is part of a pattern of criminal *gang-related* activity, or is done for the benefit of, at the direction of, or in association with, any gang, and (2) is committed with the specific intent to promote or further any of its criminal *gang-related* activity, or to assist in continuing its pattern of criminal *gang-related* activity." (Sen. Bill No. 1555, as introduced Mar. 6, 1987, § 1, p. 5, italics added [proposing Pen. Code, § 186.13, subd. (a)].) Subsequent amendments, though, deleted the italicized language (Sen. Bill No. 1555, as amended May 22, 1987, § 1, pp. 10–11), thus creating a substantive offense that applied to an active gang participant "who willfully promotes, furthers or assists in *any* felonious criminal conduct by members of that gang" and an enhancement that applied to any person convicted of a gang-related offense "with the specific intent to promote, further, or assist in *any* criminal conduct by gang members." (Former § 186.22(a) & (b), as enacted by Stats. 1988, ch. 1256, § 1, p. 4179, italics added, repealed and reenacted by Stats. 1989, ch. 930, §§ 5, 5.1, pp. 3251, 3253; see now § 186.22(a) & (b)(1).)

We also reject the argument, advanced by all three defendants, that the constitutional requirement of personal guilt would compel the inclusion in the enhancement of a specific intent to aid the *gang*. The claim is specious. The enhancement set forth in section 186.22(b)(1) does not pose a risk of conviction for mere nominal or passive involvement with a gang. Indeed, it

does not depend on membership in a gang at all. Rather, it applies when a defendant has personally committed a gang-related felony with the specific intent to aid members of that gang. Defendants cite no authority to suggest that this would run afoul of *Scales v. United States, supra,* 367 U.S. 203, which upheld a statute criminalizing active membership in an organization that advocates the overthrow of the federal government by force or violence even in the *absence* of a specific act of criminality. (*Id.* at p. 225; cf. *People v. Gardeley, supra,* 14 Cal.4th at pp. 623–624.)

█ In sum, if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members. Here, there was ample evidence that defendants intended to attack Amanda M., that they assisted each other in raping her, and that they were each members of the criminal street gang. Accordingly, there was substantial evidence that defendants acted with the specific intent to promote, further, or assist gang members in that criminal conduct.

## DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Chin, J., and Corrigan, J., concurred.

**WERDEGAR, J.,** Concurring and Dissenting.—I concur in the majority's construction of Penal Code section 186.22, subdivision (a).[1] With respect to the enhancement imposed on each defendant under subdivision (b) of section 186.22, I concur as well with the majority's conclusion that the evidence supported a true finding on the second prong, i.e., that each defendant acted "with the specific intent to promote, further, or assist in any criminal conduct by gang members" (*id.,* subd. (b)(1)). I disagree, however, that the evidence supports a true finding on the first prong of the enhancement—that the crimes were committed "for the benefit of, at the direction of, or in association with any criminal street gang." (*Ibid.*)

### I.

The proliferation of criminal street gangs and gang-related crimes is deeply troubling, impacting our neighborhoods, our citizenry and our families, and

---

[1] All further statutory references are to the Penal Code.

threatening the individual personal security of us all. In the California Street Terrorism Enforcement and Prevention Act (the STEP Act; § 186.20 et seq.), the Legislature has attempted to address this disturbing state of affairs by imposing enhanced punishment for felonies committed by a gang member if the offense is gang connected or accompanied by a gang-related purpose or intent, so that the crime is enhanced if, in its commission, the gang member acted "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).)

Notwithstanding the breadth of the enhancement, not every crime committed by gang members is related to the gang. In particular, in this case there is little evidence to conclude defendants' crimes were linked to Southside Chiques—i.e., that they were committed for the benefit of or in association with the gang—and significant reason to conclude they were not so linked. Defendants, twin brothers and their cousin, lived together with the twins' mother in the apartment where the crimes were committed. Thus, they were brought together by domestic arrangement and familial relationship, not by their membership in the gang. They spent the day of the offenses socializing with the victim and her friends, as they had done in the past without incident. The apartment where the crimes were committed—the defendants' home— was outside the gang's territory. The victim was a young and trusting acquaintance with whom defendants were friendly and with whom they apparently remained somewhat friendly even after the crimes. The victim testified that a few days after the crimes she received a hug from defendant John Madrigal at a party.

As these facts suggest, the crimes, like gang-related crimes, reflect a disturbing trend in society, but were of a sort that is often not gang related—where young men for their apparent amusement, or because they wish to impress their companions, sexually assault a young female acquaintance who mistakenly believes she is among friends. The relationship of the perpetrators to one another and to a specified group or organization often factors into this sort of crime. Reports of sexual assaults committed by members of a sports team or fraternity, or by high school students brought together by a social event, are, regrettably, not uncommon. Undoubtedly crimes of this sort are also committed by members of criminal street gangs. But although common membership in an organization may be a contributing factor, few would claim a sexual assault committed in concert by members of a sports team, fraternity or high school student body was committed "for the benefit of" or "in association with" the sports team, fraternity or high school.

In order to prove the enhancement, therefore, the prosecution's challenge was to show defendants' crimes were more than the casual, opportunistic abuse of a defenseless female acquaintance—that they were in some way tied to Southside Chiques. As no evidence showed defendants admitted to a subjective motive to benefit Southside Chiques, to show the crimes were committed for that purpose the prosecutor might have tried to show the gang solicited or encouraged such crimes, or at least that sexual assaults were typical of its members. Alternatively, because to act "in association with" an organization would seem to mean joining with the organization,[2] the prosecution might have attempted to show defendants had come together with the Southside Chiques gang for the common purpose of committing the crimes. The prosecution showed none of these things.

## II.

*To Benefit the Gang*

The only evidence presented on the relationship of the offenses to the gang was the opinion of Detective Neail Holland, the police expert on gangs and gang culture, who, in response to a hypothetical question posed by the prosecutor, stated his opinion that such crimes would have been committed for the benefit of, at the direction of, or in association with the gang. Detective Holland's opinion was built on his vivid testimony about criminal street gangs in general and Southside Chiques in particular. He explained Southside Chiques favors attempted homicide, felony assault, auto theft, felony vandalism and drug trafficking. He also explained gang members commit violent crimes as a means of communicating to the community that the gang is "a violent, aggressive gang that stops at nothing and does not care for anyone's humanity." We have upheld convictions where similar testimony supported the expert's opinion a crime was gang related. For example, in *People v. Gardeley* (1996) 14 Cal.4th 605 [59 Cal.Rptr.2d 356, 927 P.2d 713], a police expert, after describing a gang's criminal activity, opined that a vicious attack on a stranger, such as the charged assault by gang members against the victim in that case, would be gang-related activity. The expert explained the crime "was a 'classic' example of gang-related activity," relating his knowledge that "criminal street gangs rely on such violent assaults to frighten the residents of an area where the gang members sell drugs, thereby securing the gang's drug-dealing stronghold." (*Id.* at p. 619.) By articulating a rational connection between the crime and the gang's

---

[2] For example, Merriam-Webster's Eleventh Collegiate Dictionary (2004) at page 75 defines "associate," as ". . . 1 : to come or be together as partners, friends, or companions 2 : to combine or join with other parts."

activities, the expert's explanation supported his opinion, making it reasonable for the jury to conclude the attack was committed for the benefit of, at the direction of, or in association with the gang. (*Ibid.*)

Detective Holland, by contrast, expressed no knowledge that sexual assault against a young female acquaintance presented a classic example of gang-related activity. Nor did he explain that Southside Chiques encouraged such crimes or relied on them to frighten or intimidate anyone. To the contrary. Although he explained a gang would benefit from a report of the crimes, because the report would elevate the gang's "reputation to be a violent, aggressive gang that stops at nothing and does not care for anyone's humanity," he also stated that Latino gangs such as Southside Chiques disapprove of rape and crimes against children. Later, while agreeing with the prosecutor's suggestion that gang members might still commit such crimes, he explained they would do so for *themselves* or their *personal interests*, and "are not going to come back and announce that they have committed a rape or promote it that it's a rape at all, you know, and they're going to claim that law enforcement and the district attorney's office is making stuff up, you know, to protect their position [in the gang], but these crimes still occur."

No doubt these crimes still occur, and if reported they might result in a benefit to the gang as showing its members' willingness to commit violent assaults. Nevertheless, nowhere in the detective's testimony do I find any reason to conclude a sexual assault by members of a Latino gang, as here, would be *committed* for that reason. I also find nothing to aid the prosecution's case in the detective's testimony that "[w]hen three gang members go out and commit a violent brutal attack on a victim, that's elevating their individual status, and they're receiving a benefit." Even aside from the point that these gang members, if asked, would according to the detective deny having committed rape "to protect their position," his testimony explains only that a gang member might believe he, *individually*, will derive personal benefit from his crimes. And finally, I do not agree with the majority that the detective's testimony can reasonably be interpreted to mean that gang members would lose status only by being *convicted* of the crimes. (Maj. opn., *ante*, at p. 64.) To the contrary, everything Detective Holland testified to strongly suggested gang members would lose status in the gang by being publicly identified as persons who had committed sexual assault crimes.

In sum, Detective Holland stated a general rule for criminal street gangs: gangs commit violent crimes as a means of communicating their criminality to the community. He also stated an exception to that rule, that Latino gangs disapprove of rape and crimes against children, explaining that although individual members might commit such crimes despite the gang's disapproval, they would not report it for fear of losing status. Defendants' crimes

fall under the exception. Detective Holland articulated no reason for concluding defendants' crimes were in any way committed for the benefit of Southside Chiques.

The opinion of an expert can provide sufficient support for a factual finding, but the value of an expert's testimony lies not in the expert's ability to articulate the ultimate fact, but in the material from which the opinion is fashioned and the reasoning by which the expert progresses to his or her conclusion. (*People v. Lawley* (2002) 27 Cal.4th 102, 132 [115 Cal.Rptr.2d 614, 38 P.3d 461].) A conviction "in our system of justice, cannot be made to depend on whether or not the witnesses against [the defendant] correctly recite by rote a certain ritual formula." (*People v. Bassett* (1968) 69 Cal.2d 122, 140 [70 Cal.Rptr. 193, 443 P.2d 777].) In my view, Detective Holland's opinion that the crimes were committed "for the benefit of" the gang was nothing but an affirmation of the phrase stated by the prosecution in its hypothetical, given without adequate explanation or supporting evidence. It therefore had no evidentiary value. And the record is devoid of other evidence suggesting the crimes were committed for the benefit of the gang. The crimes were committed privately, and the victim did not indicate defendants referred to the gang or to themselves as gang members, either as they were committing the crimes or afterwards, as they drove the victim home. Although after the victim reported the crimes some of her acquaintances warned her against pursuing the matter, there is no evidence *defendants* reported the crimes either to Southside Chiques or to the community at large. Accordingly, the evidence does not support a finding the crimes were committed for the benefit of a criminal street gang.

### In Association with the Gang

The lack of evidence the crimes were committed for the benefit of Southside Chiques would not be fatal if the evidence supported a finding defendants acted "in association with" a criminal street gang. But again, the prosecutor produced no evidence on the point. There was no showing Southside Chiques, as an organization, was involved in or even aware of the crimes until sometime after they were committed. Indeed, the evidence was that Southside Chiques would not engage in sexual assaults and would disapprove of the offenses. The prosecutor avoided the problem by providing the jury with a meaning of the phrase "in association with" that did not require such evidence, explaining: "Association has a plain, common, ordinary meaning. Two or more gang members is an association. All three Defendants are active participants in the SouthSide Chiques. They were aware obviously by their living status, by their knowledge of each other, by their group tie that [each] one is a member of SouthSide Chiques. It's obvious that they know that the . . . other two . . . are also members of the

SouthSide Chiques. [¶] They commit the crime in concert with each other, in association with each other. They combine—they pooled their strength, they combined their muscle, they counted on each other's loyalty to be there and back them up, and it's easier to divide labor that way and [successfully complete] the crime. They do this crime in close proximity to each other, and they're assisting each other in committing the crime."

This explanation allowed the jury to find that defendants, knowing of each other's gang membership and acting together—pooling their strength and assisting each other in the commission of the crimes—acted in association with *the gang*. In so doing, it collapsed the requirement of the second prong of section 186.22, subdivision (b)—that each defendant act to promote, further or assist in criminal conduct by gang members, a finding supported by the evidence—with the requirement of the first prong—that the defendants committed the crimes in association *with the gang*, a finding having no evidentiary support.

What the Legislature intended by "in association with any criminal street gang" is unclear, but that it meant acting "in association with *members* of a criminal street gang" is unlikely. That the Legislature distinguishes between the gang and members of the gang is shown by its use of both terms throughout section 186.22, including subdivision (b). Indeed, as indicated above, interpreting "criminal street gang" in subdivision (b) to mean *"members* of a criminal street gang" creates a redundancy in the provision, as the second prong of section 186.22, subdivision (b) already requires that the crime have been committed "with the specific intent to promote, further, or assist in any criminal conduct *by gang members*." (Italics added.)

The majority provides a different definition of "in association with" a gang, explaining it means that in committing the offenses defendants relied on their "common gang membership and the apparatus of the gang." (Maj. opn., *ante*, at p. 60.) Again, by focusing on gang members as associating *with one another*, rather than as associating *with the gang*, the majority's definition also threatens to render a portion of section 186.22, subdivision (b) redundant.

Finally, the majority's interpretation, whatever its merit, was not provided to the jury. Thus, in finding the enhancements true, the jury necessarily relied on the construction of the phrase provided by the prosecutor, a construction neither consistent with the statute nor endorsed by the majority. Hence, on this ground alone the enhancement should be reversed.

## CONCLUSION

I would reverse the enhancements imposed on each defendant's sentence under section 186.22, subdivision (b).

Moreno, J., concurred.